**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EGYPT DEPARTMENT OF DEFENSE,

Plaintiff,

v.

MAHMOUD ALBOGHDADY, *et al.,*

Defendants.

Civil Action No. 21-1144 (BAH)

Chief Judge Beryl A. Howell

**MEMORANDUM OPINION**

In April 2021, plaintiff Egypt Department of Defense sued defendants Mahmoud Alboghdady and Joud, LLC, over possession of a building owned by plaintiff, which defendants leased in order to operate a hotel on the premises, and for which defendants ceased paying rent in February 2020, in violation of the Lease Agreement in effect between the parties.  Compl. ¶¶ 6, 9, 12, 15, ECF No. 1.  Plaintiff sought defendants' civil ejectment and various forms of damages under the District of Columbia civil ejectment statute, D.C. Code § 16-1101, *et seq.*, as well as damages for breach of contract and unjust enrichment, Compl. ¶¶ 66–112.

For the second time, this matter is before the Court on rival motions by plaintiff for default judgment, this time on seven of the eight counts in the Complaint, and by defendants to vacate the entries of default against them, this time on these seven counts. [1]  Plaintiff's previous motion for default judgment as to Count I of the Complaint, containing its civil ejectment claim,

---

[1]     Defendants do not state explicitly whether their request "that the entry of default be vacated against Defendants," Defs.' Renewed Mot. to Vacate Entries of Default ("Defs.' 3d Mot. Vacate") at 3, ECF No. 20, extends to all counts of the Complaint, or only to the seven counts remaining after the Court granted plaintiff's motion for default judgment as to Count I of the Complaint.  The Proposed Order submitted with defendants' motion proposes that "the Default entered by the clerk on June 21, 2021 is hereby VACATED *concerning Counts II through VII* [sic] of Plaintiff's Complaint," *see* Defs.' Proposed Order at 1, ECF No. 20-4 (emphasis added), suggesting that defendants are not contesting the Court's award of default judgment to plaintiff on Count I of the Complaint, but rather seek vacatur of the entries of default only as to the seven remaining counts, for which plaintiff seeks affirmative relief in the form of damages.

1

was granted after plaintiff "established entitlement to the entry of default judgment on its civil ejectment claim and to an order ejecting defendants from the leased premises." *Egypt Dep't of Def. v. Alboghdady* ("*Egypt DOD I*"), No. 21-cv-1144 (BAH), 2021 WL 3737682, at *6 (D.D.C. Aug. 24, 2021). Defendants' motion to vacate the entries of default as to all counts of the Complaint was denied, since their "default was willful and prejudicial" and they had "failed to assert any defense." *Id*. At the same time, default judgment on the seven remaining counts was neither requested by plaintiff nor granted by the Court.

Having retaken possession of the leased property and conducted a full assessment of its condition in the wake of defendants' departure, plaintiff has now filed a second motion for default judgment, as to the remaining seven counts of its Complaint. Pl.'s Mot. for Entry of Default J. Awarding Damages Pursuant to Rule 55(b) ("Pl.'s Mot."), ECF No. 18. Defendants oppose this motion, Defs.' Mem. in Opp'n to Pl.'s Mot. for Default J. ("Defs.' Opp'n"), ECF No. 19, and have filed a "renew[ed]" motion to vacate the Clerk's entries of default against them, Defs.' Renewed Mot. to Vacate Entries of Default ("Defs.' 3d Mot. Vacate") at 1, ECF No. 20, to which they attach an answer and counterclaim which have not been filed directly on the docket. In connection with defendants' filings, plaintiff also seeks sanctions against defendants and their counsel. Pl.'s Mot. for Sanctions ("Pl.'s Mot. Sanctions"), ECF No. 23.

For the reasons discussed below, defendants' motion to vacate the entries of default is granted, such that the case may proceed on the merits, and plaintiff's motion for default judgment on the remaining claims and motion for sanctions are denied.

## I.    BACKGROUND

The relevant factual and procedural history of this matter is summarized below, with plaintiff's factual allegations, as set out the Complaint, presumed to be true. *See Robinson v. Ergo Sols., LLC*, 4 F. Supp. 3d 171, 178 (D.D.C. 2014) ("Upon entry of default by the clerk, the

'defaulting defendant is deemed to admit every well-pleaded allegation in the complaint.'" (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002))).

### A.   Factual Background

In July 2014, plaintiff entered into a lease contract with Alboghdady for plaintiff's building at 2590 L Street, N.W. [2]  Compl. ¶ 6; *id.*, Ex. 1, Lease Agreement at 1, 16, ECF No. 1-1.  The next month, Alboghdady incorporated Joud, LLC, to operate a hotel on the premises. Compl. ¶¶ 9–10; *see also* Lease Agreement § 2 ("Tenant shall use the Premises as hotel accommodations and for no other purpose.").

The Lease Agreement, which was signed by Alboghdady and plaintiff's representative, *see* Lease Agreement at 16, provided for defendants to occupy the premises for seven years, beginning September 1, 2014, and ending August 31, 2021, Compl. ¶ 7; Lease Agreement § 1. Alboghdady was required to pay plaintiff rent in monthly installments of $45,000 for the first three years of the rental; $46,350 per month in year four; $47,740.50 per month in year five; $49,172.75 per month in year six; and $50,648 per month in the final year.  Compl. ¶ 12; Lease Agreement § 3.1(a).  Rent was due on the first of the month, with a 10% late fee assessed where rent was not paid within the first five days.  Compl. ¶ 13; Lease Agreement § 3.8.  The Lease Agreement stipulated that plaintiff's acceptance of partial or late payments did not waive its right to recover the full balance owed, including for unpaid late fees.  Compl. ¶ 27; Lease Agreement § 3.4.  Alboghdady was also required to post a $180,000 security deposit, of which plaintiff was permitted to "use, apply or retain all or part . . . for the payment of rent or any other sum in default," although plaintiff was "not . . . required" to do so.  Lease Agreement § 4; *see also*

---

[2]    The District of Columbia later changed the address for the building to 1005 26th Street, N.W.  Compl. ¶ 6.

Compl. ¶ 39.  On September 2, 2014, defendants paid plaintiff a security deposit in this amount from an account held by "Joud Real Estate LLC."  Pl.'s Mot., Ex. 3, Decl. of Col. Ahmed Farrag ("Farrag Decl.") ¶ 5, ECF No. 18-5.

Under the terms of the Lease Agreement, Alboghdady was required to maintain the premises in good condition throughout the term of the rental, Compl. ¶ 46; Lease Agreement § 12(a), and to restore the property to its original condition at the end of the tenancy, Compl. ¶ 46; Lease Agreement §§ 7, 10.  He was responsible for payment of all utilities, including water and gas, Lease Agreement § 3.1, and for the upkeep and repair of the "foundation, roof, exterior, building walls, and the outer walls (including doors, locks, door jambs, windows, and glass)," *id.* § 12(a).  Pursuant to the Lease Agreement, Alboghdady agreed to procure and maintain various types of insurance "[t]hroughout the Lease Term," including public liability and property damage insurance; state worker's compensation insurance; and business interruption insurance "equal to 100% of the Base Annual Rental for a period of indemnification of not less than 12 months."  *Id.* at 4; *see also* Compl. ¶ 52.  The Lease Agreement specified that the policies should designate plaintiff as a "named additional insured[]" and that Alboghdady should "provide to [plaintiff] . . . certificates of insurance or, upon [plaintiff]'s request, duplicate originals of insurance policies evidencing that insurance satisfying the requirements of this Lease is in effect at all times."  Lease Agreement at 5; *see also* Compl. ¶ 53.  Although not covered under the terms of the Lease Agreement, plaintiff also "supplied Defendants with the full assortment of furniture they then used to operate the hotel," Compl. ¶ 48, which "were to be maintained in good condition by Defendants under the Lease Agreement and returned to [plaintiff] when Defendants vacated the building," Farrag Decl. ¶ 11.

Throughout the tenancy, Alboghdady "never paid . . . rent on time," Compl. ¶ 24, and regularly failed to pay the contractual ten percent fee for late payments, *id.* ¶ 26, until, over the final two years of the lease term, "the situation became steadily more untenable," *id.* ¶ 24. Alboghdady paid rent for January 2020 "more than 6 months after it was due," and did not pay rent for February 2020 until December of that year.  *Id*.  No subsequent payments were made. *Id.*  Although plaintiff applied the $180,000 security deposit to offset the overdue rent and late fees, such amount was far insufficient to cover the total rent in arrears.  *Id.* ¶¶ 40–43.  Yet despite Alboghdady's failure to pay rent from March 2020 through August 31, 2021, *id.* ¶ 15, defendants continued to operate the premises as a hotel throughout this period, *id.* ¶ 17.

For the duration of defendants' tenancy, plaintiff repeatedly asked defendants to provide proof they had secured the requisite insurance policies under the Lease Agreement, to which defendants continually responded "with assurances that [they] had the policies and documentation would be provided."  Farrag Decl. ¶ 7.  Ultimately, however, plaintiff only received "a copy of a Worker's Compensation and Employers Liability Policy for Joud LLC which provided coverage from June 29, 2021 – June 29, 2022," meaning it covered "only the last two months of the Lease."  Pl.'s Mot., Ex.1, Decl. of Haig V. Kalbian ("Kalbian Decl.") ¶ 7, ECF No. 18-2.

Prior to filing the instant suit, plaintiff attempted to "resolve this matter" by proposing to Alboghdady, via counsel, a tenant payment plan pursuant to D.C. Code § 42-3192.01 (2021), Compl. ¶¶ 33–34, which was enacted by the D.C. Council in response to the COVID-19 pandemic to provide commercial tenants with a demonstrable "inability to pay all or a portion of the rent due as a result of the public health emergency," the opportunity to negotiate a payment plan with their landlord, D.C. Code § 42-3192.01(h)(1)(A).  If a payment plan were in place, the

landlord would be prohibited from "filing any collection lawsuit or eviction for non-payment of rent," *id.* § 42-3192.01(g), or reporting the tenant "to a credit reporting agency as delinquent," *id.* § 42-3192.01(a)(3).  Plaintiff "received no response" from defendants to this proposal.  Compl. ¶ 35.

In accordance with the Court's August 24, 2021, Order, defendants vacated the premises on August 31, 2021.  Pl.'s Status Report ¶ 6, ECF No. 17.  Plaintiff thereafter "initiated an inspection of the Premises" which included "a walkthrough of all individual units."  *Id.* ¶ 7.  The inspection, which was conducted by "engineering and architecture experts" hired by plaintiff, lasted two days, with defendants' representative present for the first portion and "consent[ing] for the remainder of the process to be completed without a delegate present."  Pl.'s Mem. Supp. Mot. Default J. as to Damages ("Pl.'s Mem.") at 9, ECF No. 18; *see also* Pl.'s Status Report, Ex. 1, Acknowledgement of Inspection, ECF No. 17-1.  The expert then prepared a report which "detailed extensive damages virtually throughout the Premises."  Pl.'s Mem. at 9; *see also* Pl.'s Mot., Ex. 2, Inspection Report, ECF No. 18-3.  Specifically, the report documented, *inter alia*, damage to the garage door "beyond repair"; missing guard rails on the first floor windows; discoloration adjacent to HVAC ducts indicating a need to clean out the entire system; "[w]ater damage and temporary un-matched repairs throughout the main lobby" and conference room; and "excessive wear and tear at walls, floor, ceilings and doors" of "[a]ll common areas" as well as "[n]oticeable stains . . . on the vast majority of carpets" and missing ceiling tiles throughout the building.  Inspection Report at 5.  The report further details broken equipment, corroding sinks, and cabinets hanging off the wall in the commercial kitchen; broken toilets and plumbing; corrosion on the emergency generator; extensive damage and rusting to the "generator compartment" with "no indication [that] any routine maintenance had been [done] in the past

years" and rust on the fire pump and sprinkler drainpipes, with the fire alarm strobe lights "flashing continuously" in one of the stairwells.  *Id.* at 6–9.

During the walkthrough, plaintiff also discovered that "numerous items" it had provided "were either damaged, irreconcilably broken, or missing from the Premises," including "many pieces of furniture, appliances provided for most of the hotel rooms, and pieces of artwork originally hung in hallways and rooms throughout the building which had been stacked in the garaged without climate control for an unknown number of years and effectively ruined."  Farrag Decl. ¶ 13; *see also* Pl.'s Mem. at 10–11.  Plaintiff also learned that defendants had "failed to remove all of their belongings from the Premises, as well as those of third-party vendors with whom they contracted," Pl.'s Status Report ¶ 14, and "left behind massive amounts of trash throughout the building," Pl.'s Mem. at 11; *see also* Farrag Decl. ¶ 15.

In the months after defendants' departure, while "work[ing] to coordinate the turnover of utility obligations for the Premises," plaintiff discovered that defendants had incurred substantial debts—$2,938.56 to DC Water and $31,235.55 to Washington Gas, respectively—and had, without plaintiff's "authorization or knowledge [and] in violation of the Lease Agreement," Farrag Decl. ¶¶ 18–19, "transferred some of the accounts into Plaintiff's name years prior," Kalbian Decl. ¶ 18, "leading the providers to demand payment of these debts from [plaintiff]," Farrag Decl. ¶ 19.  Washington Gas has since "disconnected service to the Premises because of the high unpaid balance and refused to reconnect it unless the debt [is] promptly paid."  *Id.* ¶ 20.

### B.   Procedural History

On April 27, 2021, plaintiff filed suit against defendants Mahmoud Alboghdady and Joud, LLC, bringing eight claims.  In Count One, plaintiff sought civil ejectment of both defendants from the premises under D.C. Code § 16-1124, on the grounds that they had failed to pay rent for more than six months.  Compl. ¶¶ 66–72.  In Counts Two through Six, plaintiff

sought various forms of damages under provisions of the D.C. Code which permit a plaintiff to bring claims for damages in connection with a civil ejectment action. *Id.* ¶¶ 73–94. Specifically, Count Two sought recovery of the value of the property during the period of dispossession and damages against both defendants, *id.* ¶¶ 73–78; Count Three sought recovery of furniture against Alboghdady only, *id.* ¶¶ 79–82; Count Four sought back rent against Alboghdady only, *id.* ¶¶ 83–86; Count Five sought double rent against Alboghdady only, *id.* ¶¶ 87–90; and Count Six sought recovery of damages to the premises against Alboghdady only, *id.* ¶¶ 91–94. Count Seven contained a common-law claim for breach of contract against Alboghdady only, seeking damages in connection with his alleged violations of the Lease Agreement. *Id*. ¶¶ 95–104. Finally, Count Eight claimed unjust enrichment against both defendants seeking disgorgement in connection with their failure to pay rent and late fees and maintain insurance on the property. *Id.* ¶¶ 105–112.

Service was effected on Alboghdady on May 17, 2021, in his capacity as the registered agent of Joud LLC, Return of Service Affidavit (Joud LLC), ECF No. 5, and on May 20, 2021, in his individual capacity, Return of Service Affidavit (Alboghdady), ECF No. 4. On June 15, 2021, days after Alboghdady's answer was due, plaintiff filed a request for entry of default, *see* Pl.'s Request for Entry of Default, ECF No. 6, and, on June 21, 2021, the Clerk of the Court entered default against each of the defendants. Clerk's Entry of Default as to Joud LLC, ECF No. 7; Clerk's Entry of Default as to Mahmoud Alboghdady, ECF No. 8. More than two weeks later, defendants attempted to move for vacatur of the entries of default, *see* Defs.' Mot. to Vacate Entry of Default, ECF No. 9, but the motion was struck for failure to confer with the opposing party before the filing of the non-dispositive motion, as is required under the D.D.C. Local Rules and the Court's Standing Order. *See* Min. Order (July 9, 2021) (citing D.D.C. LCvR

7(m); Standing Order ¶ 5(d), ECF No. 3).

Defendants did not promptly cure the defect or refile their motion, and ten days later, on July 19, 2021, plaintiff moved for default judgment on the civil ejectment count of the Complaint, seeking an order requiring defendants to vacate the premises.  Pl.'s Mot. for Entry of Default J. Pursuant to Rule 55(b) on Pl.'s Ejectment Claim ("Pl's Ejectment Mot."), ECF No. 10. Plaintiff sought default judgment on the first claim alone, "reserv[ing] its claims for damages on all Counts until a later date," because money damages sought in the other claims were "not currently calculable because the Plaintiff need[ed] to retake possession of the Premises in order to assess the full extent of the repairs that will be needed."  Pl.'s Mem. Supp. Mot. for Entry of Default J. Pursuant to Rule 55(b) on Pl.'s Ejectment Claim at 4, ECF No. 10-1.  The following day, defendants filed a sparse, conclusory motion to vacate the entries of default as to all claims, Defs.' Mot. to Vacate Entry of Default ("Defs.' 2d Mot. Vacate"), ECF No. 11, which largely duplicated their first, unsuccessfully filed motion.  This three-page motion was also filed in slightly modified form as a memorandum in opposition to plaintiff's motion for default judgment.  Defs.' Opp'n to Pl.'s Mot. for Default J., ECF No. 12.

On August 24, 2021, the Court granted plaintiff's motion, denied defendants' motion, and entered default judgment in plaintiff's favor on plaintiff's claim for civil ejectment in Count I of the Complaint.  *See* Order at 1, ECF No. 15.  The Order further directed defendants to vacate the premises by August 31, 2021, and plaintiff to "file a status report on September 20, 2021 . . . apprising the Court of its efforts" to assess the damages to the premises "until all remaining claims are resolved."  *Id.* at 1–2.  In the Memorandum Opinion accompanying the Order, this Court held that "[p]laintiff has shown prejudice from defendants' willful default, and defendants have presented no meritorious defense to, nor even seriously contested, plaintiff's civil ejectment

claim under D.C. Code § 16-1124," such that judgment in favor of plaintiff was warranted on this claim. *Egypt DOD I*, 2021 WL 3737682, at *1. The Court found that the "broader context" supported a finding that defendants' default was willful, including because defendants "had been in negotiations for nearly a year over their failure to pay rent on a commercial lease and were thus plainly aware of the possibility that their failure to pay rent could lead to litigation," the excuses they gave for their behavior were "patently false," and they had "engaged in dilatory conduct in pursuing vacatur of the entry of default." *Id.* at *4. The Court concluded that plaintiff would "plainly be[] prejudiced by the delay" posed by setting aside the default, *id.* at *5, and that defendants had "failed to present any meritorious defense," or contest the allegations that they had "accumulated over a *year* of unpaid rent payments at the time this suit was filed," *id.* at *6 (emphasis in original). The Court found defendants' assertion that they had a "significant counterclaim and a defense of prior breach of the lease by Plaintiff" failed because defendants had "alleged no 'specific facts' supporting the allegation of prior breach," *id.* (quoting *Collura v. Ford*, No. 13-cv-4066 (GEP), 2016 WL 409228, at *12 (E.D. Pa. Feb. 3, 2016)), and further because the "alleged [prior] breach of the lease f[ell] far short of a 'complete defense' to defeat the ejectment claim," *id.* As for plaintiff's motion for default judgment on the civil ejectment claim, the Court found default judgment granting civil ejectment was warranted because defendants had "accrued . . . well over a year of unpaid rent," which the security deposit was not "nearly enough to cover," *id.*, rendering plaintiff without "a 'sufficiency of goods and chattels whereon to distrain for the satisfaction of the rent due,'" *id.* (quoting D.C. Code § 16-1124(a)).

On September 20, 2021, in response to the Court's Order, plaintiff filed a status report stating that defendants indeed had vacated the premises on August 31, 2021, Pl.'s Status Report

¶ 6, and that plaintiff had contracted with an expert to inspect the premises and prepare a report assessing the costs for repair, which were "substantial," *id.* ¶¶ 7–11.  On October 20, 2021, after receiving the expert's report and finalizing its damages calculations, plaintiff moved for default judgment on the remaining seven counts in its Complaint.  Pl.'s Mot.  Defendants responded, on November 3, 2021, with the filing of two overlapping documents, one docketed as an opposition to plaintiff's motion, *see* Defs.' Opp'n, and the other bearing the same title, but docketed as a motion to vacate the entries of default against them, *see* Defs.' 3d Mot. Vacate.  Both filings were largely duplicative of defendants' previous motion to vacate, which this Court had denied, *see* Order at 1, although along with each document, defendants filed an answer and counterclaim which had not previously been submitted, *see* Defs.' 3d Mot. Vacate, Ex. 1, Answer, ECF No. 20-1; Defs.' 3d Mot. Vacate, Ex. 2, Counterclaim, ECF No. 20-2. [3]  In response to defendants' filings, plaintiff submitted a combined reply in support of its motion for default judgment and in opposition to defendants' motion to vacate the entries of default.  Pl.'s Reply Supp. Mot. Default J. Awarding Damages & Opp'n to Defs.' Renewed Mot. Vacate Default ("Pl.'s Opp'n"), ECF No. 21. [4]

Prompted by defendants' renewed attempts to vacate the entries of default, on December 1, 2021, plaintiff moved for imposition of sanctions on defendants and their counsel, Pl.'s Mot. Sanctions, which is opposed by defendants, *see* Defs.' Mem. in Opp'n to Pl.'s Mot. for Sanctions ("Defs.' Opp'n Mot. Sanctions"), ECF No. 24.  Plaintiff's reply was filed on December 22, 2021.

---

[3]     Defendants attach the same two documents as exhibits to their memorandum in opposition to plaintiff's motion for default judgment.  *See* Defs.' Opp'n, Ex. 1, Answer, ECF No. 19-1; Defs.' Opp'n, Ex. 2, Counterclaim, ECF No. 19-2.  To simplify citation, only the answer and counterclaim filed at ECF Nos. 20-1 and 20-2, respectively, will be cited.
[4]      Plaintiff's memorandum is docketed twice, once at ECF No. 21 and once at ECF No. 22.  To simplify citation, only the memorandum docketed at ECF No. 21 is cited.

*See* Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Sanctions ("Pl.'s Reply Supp. Mot. Sanctions"), ECF No. 25.

Now, all three pending motions—plaintiff's motion for default judgment on the remaining seven counts in its Complaint, defendants' motion to vacate the entries of default on these seven counts, and plaintiff's motion for sanctions— are ripe for resolution. [5]

## II.   LEGAL STANDARD

"[T]he Federal Rules of Civil Procedure provide for default judgments . . . [to] safeguard plaintiffs 'when the adversary process has been halted because of an essentially unresponsive party,'" and to protect the "the diligent party . . . lest he be faced with interminable delay and continued uncertainty as to his rights." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (quoting *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). FEDERAL RULE OF CIVIL PROCEDURE 55(a) states, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." FED. R. CIV. P. 55(a); *see* 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2682 (4th ed. 2018) ("When the prerequisites of Rule 55(a) are satisfied, an entry of default may be made by the clerk without any action being taken by the court . . . [as long as] the clerk [has] examine[d] the affidavits filed and [found] that they meet the requirements of Rule 55(a)."). "[A]n entry of default is merely a formal matter and does not constitute the entry of judgment." *Id.*

Rule 55(c) further provides that a "court may set aside an entry of default for good cause." FED. R. CIV. P. 55(c). The D.C. Circuit has outlined three factors, first articulated in

---

[5]     Defendants filed no reply in support of their motion to vacate the entries of default and the seven day period to do so has long since passed. *See* D.D.C. LCvR 7(d) ("Within seven days after service of the memorandum in opposition the moving party may serve and file a reply memorandum.").

*Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980), to consider in the exercise of discretion under Rule 55(c): "whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious," *Mohamad v. Rajoub*, 634 F.3d 604, 606 (D.C. Cir. 2011) (quoting *Keegel*, 627 F.2d at 373).  The three factors articulated in *Keegel* are not exclusive, however, as the "good cause" standard of Rule 55(c) "is designed to empower courts to consider the equities that specially arise in a given case."  *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 966 (D.C. Cir. 2016).  Thus, because "[t]here is an interest favoring 'the resolution of genuine disputes on their merits,'" *Kochinsky v. Republic of Poland*, 1 F.4th 1, 7 (D.C. Cir. 2021) (quoting *Jackson*, 636 F.2d at 835), and because "all doubts are resolved in favor of the party seeking relief" on motions to vacate an entry of default, *Jackson*, 636 F.2d at 836, Rule 55(c) uses a "lenient" standard, *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981) (noting "the standard for setting aside the entry of a default pursuant to Rule 55(c) is less rigorous than the 'excusable neglect' standard for setting aside a default judgment by motion pursuant to Rule 60(b)" (citing *Keegel*, 627 F.2d at 375 n.5)), which leaves the determination to the Court's discretion, *see Gilmore*, 843 F.3d at 965–66 (differentiating between Fed. R. Civ. P. 55 and 60(b)).

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2).  "The determination of whether default judgment is appropriate [under Rule 55(b)(2)] is committed to the discretion of the trial court."  *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (citing *Jackson*, 636 F.2d at 836).  Default judgment is appropriate if defendants are "totally unresponsive" and the failure to respond is "plainly willful, as reflected by [the party's] failure to respond 'either to the summons and

complaint, the entry of default, or the motion for default judgment.'"  *District of Columbia v. Butler*, 713 F. Supp. 2d 61, 64 (D.D.C. 2010) (quoting *Gutierrez v. Berg Contracting Inc.*, No. 99-cv-3044 (TAF), 2000 WL 331721, at *1 (D.D.C. Mar. 20, 2000)).  When there is an "absence of any request to set aside the default or suggestion by the defendant that it has a meritorious defense, it is clear that the standard for default judgment has been satisfied."  *Int'l Painters*, 531 F. Supp. 2d at 57 (internal quotations omitted).

"[E]ntry of a default judgment is not automatic," *Mwani*, 417 F.3d at 6, however, and so the procedural posture of a default does not relieve a federal court of its "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party," *Olson v. United States*, 953 F. Supp. 2d 223, 228 (D.D.C. 2013) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.

## III.  DISCUSSION

Plaintiff moves for entry of default judgment on the remaining seven counts of its Complaint, arguing that default judgment is appropriate because the Court already granted default judgment on plaintiff's civil ejectment claim, and because defendants "have failed to defend the action."  Pl.'s Mem. at 1.  Defendants counter that plaintiff has made "multiple factual allegations for which a trial . . . is necessary" and that they "should have the opportunity to defend the issue of damages."  Defs.' Opp'n ¶ 1.  Although defendants' original default was willful, *see* Part III.A.1. *infra*, other relevant factors weigh in favor of allowing the case to proceed toward the resolution of the parties' "genuine disputes on their merits," *Jackson*, 636 F.2d at 832.  Consequently, plaintiff's motion for default judgment on the remaining seven

14

counts in the Complaint is denied.  For similar reasons, set forth below, sanctions on defendants and their counsel are not warranted at this time.

Defendants' motion to vacate the entries of default is discussed first, followed by plaintiff's motions for sanctions.

**A.  Defendants' Motion to Vacate Entries of Default**

Defendants have "renew[ed] their Motion to vacate the clerk's entries of default," Defs.' 3d. Mot. Vacate at 1, making "significant additions" to their previous arguments and "includ[ing] some of the things that the Court previously found deficient in the initial Motion to Vacate," Defs.' Opp'n Mot. Sanctions ¶¶ 5–6.  With the instant motion, defendants have now made an adequate showing that entries of default should be vacated, and plaintiff's motion for default judgment denied, based on the existence of a meritorious defense and "[b]ecause strong policies favor the resolution of genuine disputes on their merits." *Jackson*, 636 F.2d at 832.  The *Keegel* factors are addressed *seriatim* below.

**1.  Defendants' Delay was Willful**

The first *Keegel* factor asks whether the default was willful, with "[t]he boundary of willfulness [lying] somewhere between a negligent filing error . . . and a deliberate decision to default, which is generally not excusable." *Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co.*, 288 F. Supp. 2d 22, 26 (D.D.C. 2003).  Here, as previously found, the evidence before the Court strongly supports the conclusion that it was willful.  In the instant motion, defendants repeat their arguments, previously dismissed by the Court as "meritless," *Egypt DOD I*, 2021 WL 3737682, at *4, that service on defendant Joud, LLC, may have been improper, and that their delay in responding to the Complaint was justified by a need to accrue sufficient resources to respond and engage local counsel, Defs.' 3d Mot. Vacate ¶¶ 1–2.  The Court previously rejected these claims, explaining that the "action should

not have come as a surprise to defendants," as "counsel for the two parties had been regularly discussing the dispute for nearly a year," and even if defendants had "needed some time to retain counsel to litigate in this Court, . . . that does not come close to explaining the 50-day gap between service of process and the filing of defendants' first motion to vacate the entry of default."  *Egypt DOD I*, 2021 WL 3737682, at *4.  The willfulness issue has already been decided against defendants, and no "good cause" for reconsideration of this prior finding has been shown.  *See* FED. R. CIV. P. 55(c); *see also Kimberlin v. Quinlan,* 199 F.3d 496, 500 (D.C. Cir. 1999) ("The law-of-the-case doctrine rests on a simple premise: the same issue presented a second time in the same case in the same court should lead to the same result." (internal quotations and emphases omitted)); *Robinson v. Ergo Sols., LLC*, No. 12-cv-147 (JDB), 2014 WL 12788937, at *2 (D.D.C. Feb. 12, 2014) (denying motion to reconsider denial of motion to vacate default because the "Court ha[d] already decided these issues against [defendant]—twice" and defendant "offer[ed] no 'good cause' to reconsider those decisions now" (quoting FED. R. CIV. P. 55(c))).

Even were the Court to reconsider its prior rejection of these arguments, defendants' assertion that their default was innocent is undercut by their recent admission, in a filing connected to plaintiff's motion for sanctions, that defendants' Washington, D.C.-based counsel of record and their general counsel "have worked together for approximately twenty years" and that the general counsel "used to be an associate and member of local counsel's firm."  Defs.' Opp'n Mot. Sanctions ¶ 7.  This admission renders even more suspect defendants' claim that their significant delay in responding to the Complaint was due to a need to locate, retain, and brief local counsel, given that the counsel who eventually appeared had such a close and longstanding relationship with defendants' general counsel.

In addition to their previous arguments for why their default was not willful, all of which were rejected by this Court previously and continue to be unavailing, defendants assert for the first time in the instant motion that their default was simply an unfortunate result of the COVID-19 pandemic.  Defs.' 3d Mot. Vacate ¶¶ 3, 6.  Defendants claim that they "did not act willfully in defaulting," *id.* ¶ 6, but were stymied in presenting any defense because of the "significant and lasting damage" caused by the COVID-19 pandemic to their "resources," including because "Joud, LLC, operated a premises [sic] that took revenues from guests at the property at issue," which business "was devastated by the COVID pandemic," *id.* ¶ 3.  They claim, without providing any support, that these "financial difficulties" contributed to "much of the lack of payments about which Plaintiff complains," as well as their difficulties in "defending this action . . . given the expense and lack of revenue."  *Id.*

Defendants' explanation might be more persuasive but for the fact that their alleged failure to comply with the terms of the Lease Agreement predates the COVID-19 pandemic. Plaintiff asserts, and defendants do not deny, that defendants "ceased entirely to make rent payments" in January 2020, Compl. ¶ 24, well before the Washington, D.C. region felt the effects of the COVID-19 pandemic or restrictions hampering nonessential travel took effect, *see* Patricia Zengerle & Susan Heavey, *U.S. Federal Buildings Put Away the Welcome Mat as Coronavirus Hits*, REUTERS (March 12, 2020), https://www.reuters.com/article/health-coronavirus-usa-capitol/update-5-us-federal-buildings-put-away-the-welcome-mat-as-coronavirus-hits-idUSL1N2B50S4.  As for other provisions in the Lease Agreement, plaintiff asserts that even before Alboghdady "ceased making rent payments altogether," he failed to pay the contractually-obligated ten percent late fee for numerous months, beginning as early as 2014. Compl. ¶¶ 26, 28.  Furthermore, despite the contractual obligation to maintain various insurance

policies throughout the lease term—including business interruption insurance, which likely would have lessened the financial turmoil into which the COVID-19 pandemic threw defendants' hotel business—the single policy ever furnished by defendants to plaintiff was effective for the final two months of the lease only, and covered only a portion of the risks against which defendants were obligated to protect themselves.  *See* Kalbian Decl. ¶¶ 6–10.  Given defendants' admission that "[a]ll insurance in formation in [their] possession" has been provided, Defs.' Opp'n ¶ 3, the only conclusion is that defendants failed to secure or maintain insurance and thus were in violation of the Lease Agreement for most, if not all, of its duration—including before the COVID-19 pandemic began.  Regardless of the impact wrought by the COVID-19 pandemic on defendants' business and finances, it does not explain or excuse their chronic failure to pay rent timely and in full, and to comply with the other provisions of the Lease Agreement.  *See Martinez v. Dart Trans, Inc.*, 547 F. Supp. 3d 1153, 1184 (D.N.M. 2021) (declining to vacate entry of default judgment against defendant corporation which argued that its default was due to the COVID-19 pandemic because defendant had "provide[d] no support, such as financial documentation, demonstrating how the pandemic affected its income," and default judgment had been granted in January 2020, such that there was "no connection between the COVID-19 pandemic and [defendant]'s income during the relevant time period of this litigation"); *cf. Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P.*, No. 21-cv-38 (MKV), 2021 WL 535485, at *6–*7 (S.D.N.Y. Feb. 12, 2021) (denying plaintiff's motion for preliminary injunction filed nine months after first threatening to seek such relief because "[t]he COVID-19 pandemic does not excuse such an extensive delay" and "simply say[ing] the word 'COVID-19'" is not "in and of itself, . . . justification to excuse delays and dereliction without providing any support.'" (quoting *Martinez v. Costco Wholesale Corp.*, 336 F.R.D. 183, 188 (S.D. Cal. 2020))).

18

Defendants' assertions that their default was not willful are also unconvincing because of their continued pattern of delinquent behavior leading up to and during the litigation. *See Egypt DOD I*, 2021 WL 3737682, at *4–*5. Defendants could have sought an extension of time to respond to the Complaint, but did not. Alboghdady is a sophisticated commercial actor who had retained counsel throughout the relevant period, *see* Defs.' 3d Mot. Vacate ¶ 2, and yet this counsel made no effort to seek additional time to comply with the requirements of the litigation. Nor did defendants make any attempt to remedy the situation outside of the context of this lawsuit: plaintiff indicates, and defendants do not contest, that it "made numerous good faith efforts to resolve this matter," including offering "Alboghdady, via his legal counsel, a tenant payment plan pursuant to D.C. Code § 42-3192.01," Compl. ¶¶ 33–34, to which plaintiff "received no response," *id.* ¶ 35. Additionally, in the months after the Court issued its first Order denying their motion to vacate the entries of default, defendants waited silently for plaintiff to act, making no active efforts to avoid default judgment or defend their own interests in the litigation. *Cf. Delta Sigma Theta Sorority, Inc. v. LaMith Designs, Inc.,* 275 F.R.D. 20, 27 (D.D.C. 2011) (finding that "defendant's default was not willful" because "the defendant [had] participated in settlement negotiations with the plaintiff[,] . . . attempted to file a responsive pleading by the informal deadline agreed upon by the parties, and . . . moved to vacate the Clerk's entry of default and re-file a responsive pleading shortly after it became aware that its June 1, 2010 pleading would not be accepted"). Given defendants' continually flaccid attitude to the instant suit, the Court cannot help but conclude that their default amounted to "a deliberate decision," *Int'l Painters & Allied Trades Union & Indus. Pension Fund*, 288 F. Supp. 2d at 26, which the Court cannot excuse. Defendants' delay was willful.

A finding of willful default, however, is not dispositive.  A court may set aside an entry of default even where a defendant defaulted willfully, where other factors weigh in favor of granting vacatur.  *See, e.g., Africa Growth Corp. v. Republic of Angola*, No. 17-cv-2469 (BAH), 2018 WL 6329453, at *5 (D.D.C. Dec. 3, 2018) (setting aside entry of default despite defendant's "inexcusable" eight-month delay in "showing up to litigate the matter, by filing a motion to set aside the entry of default," as the other *Keegel* factors weight in favor of vacatur); *Shatsky v. Syrian Arab Republic*, 795 F. Supp. 2d 79, 81–83 (D.D.C. 2011) (vacating entry of default, despite finding it was "overwhelmingly clear that defendants' default in this case was willful," where the Court was "convinced that [defendants] are truly committed to litigating this matter" and other *Keegel* factors supported vacatur); *Haskins v. U.S. One Transp., LLC*, 755 F. Supp. 2d 126, 130 (D.D.C. 2010) (setting aside entry of default even though defendant's default was "at least to some degree, willful"); *Simon v. Republic of Hungary*, No. 10-cv-1770 (BAH), 2012 WL 13069771, at *5 (D.D.C. Sept. 30, 2012) ("[E]ven if the Court were to construe [defendants]'s intentional decision to avoid entering an appearance in this case as 'willful,' the Court may balance the 'willfulness' factor against the remaining two factors in the Rule 55(c) analysis in assessing whether to vacate the entry of default.").

### 2. An Order Setting Aside the Entries of Default Would Not Prejudice Plaintiff

The second *Keegel* factor asks whether setting aside the entries of default would prejudice plaintiff.  Defendants argue that since they "have been out of the premises, as they had always planned to be, on August 31, 2021, there is no prejudice to the Plaintiff in adjudicating the damages claims," as plaintiff has now retaken possession of the premises.  Defs.' 3d Mot. Vacate ¶ 6.  Plaintiff objects that it would still be prejudiced by setting aside the default because the "building is currently in an inoperable condition," due to "the deplorable condition in which

Defendants left it," and plaintiff "requires the funds identified in its Motion to enable it to bring the property up to code and leasable to a new client."  Pl.'s Opp'n at 11.

What the plaintiff characterizes as "prejudice" is, in reality, no different than a mere delay in receiving the remedy sought.  If, after this case proceeds forward on the merits, plaintiff's claims are successful, the cost of restoration of the premises will be recouped in the form of a money judgment against defendants.  If plaintiff's claims are unsuccessful, it will face the same choice it presumably does now: whether the benefits of leasing the property to a new tenant outweigh the costs of returning the building to a marketable state.

Plaintiff understandably wishes to recover damages from defendants' allegedly destructive use of plaintiff's property and breaches of the Lease Agreement between them, but "prejudice" in this context requires showing some harm beyond mere delay in obtaining such relief.  *See CapitalKeys, LLC v. Democratic Republic of Congo*, No. 15-cv-2079 (KBJ), 2020 WL 7029934, at *3 (D.D.C. Feb. 14, 2020) ("[C]ourts have been clear that '[d]elay in and of itself does not constitute prejudice' in the absence of other accompanying tangible harms, such as 'loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion.'" (quoting *Capital Yacht Club v. Vessel AVIVA*, 228 F.R.D. 389, 393–94 (D.D.C. 2005))); *Lerch Bates, Inc. v. Michael Blades & Assocs., Ltd.*, No. 20-cv-2223 (BAH), 2021 WL 3363414, at *5 (D.D.C. Aug. 3, 2021) (dismissing plaintiff's prejudice argument because the harm of having "to establish the merits of its claim does not constitute prejudice for purposes of setting aside an entry of default." (citing *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 785 (8th Cir. 1998))).

The lack of prejudice to plaintiff from setting aside the entries of default thus weighs in favor of granting defendants' motion.

### 3.    Defendants Have Asserted a Meritorious Defense

The final *Keegel* factor considers whether any defenses asserted by defendants are

"meritorious."  627 F.2d at 374.  Importantly, "meritorious" in this context does not mean having

a "[l]ikelihood of success," *id.*, but is a "very low bar," *CapitalKeys, LLC*, 2020 WL 7029934, at

*3, meaning that a defense "contain[s] 'even a hint of a suggestion' which, if proven at trial,

would constitute a complete defense," *Keegel*, 627 F.2d at 374 (quoting *Moldwood Corp. v.

Stutts*, 410 F.2d 351, 352 (5th Cir. 1969)); *see also Whelan v. Abell*, 48 F.3d 1247, 1259 (D.C.

Cir. 1995) (A party seeking to set aside an entry of default "is not required to prove a defense,

but only to assert a defense that it may prove at trial.").  The defenses now before the Court

satisfy this standard to proceed to the merits.

Defendants argue that setting aside the entries of default is warranted because the extent

of their liability for "Plaintiff's damages [is] uncertain."  Defs.' 3d Mot. Vacate ¶ 7.  They

contest the damages figures set forth in plaintiff's motion for default judgment, arguing that "a

trial on the issue of damages is necessary" regarding defendants' liability for injury to "both the

furnishings in the premises at issue (Count III of Plaintiff's Complaint) and the premises itself

(Count VI of Plaintiff's Complaint)."  Defs.' Opp'n ¶ 1.  Defendants explain that "[t]he property

in question in this action was old and had not been renovated for decades," and that the damages

documented in the Inspection Report "are almost entirely wear and tear due to the age of the

building and the furnishings in question."  *Id.*  While plaintiff vigorously contests these

assertions, *see* Pl.'s Opp'n at 7–9, defendants have "alleged colorable defenses," *CapitalKeys,

LLC*, 2020 WL 7029934, at *3, and "[t]he test is not whether the defendant will win at trial, but

rather whether the facts alleged by the defendant would constitute a meritorious defense if true,"

*Wilson v. Superclub Ibiza, LLC*, 279 F.R.D. 176, 179 (D.D.C. 2012) (quoting *In re Park Nursing

Ctr., Inc.*, 766 F.2d 261, 264 (6th Cir. 1985)).  *See also Marino v. Drug Enf't Admin.*, 685 F.3d

1076, 1080 (D.C. Cir. 2012) (in the context of a Rule 60(b) motion for relief from final judgment, finding defendant "need only provide reason to believe that vacating the judgment will not be an empty exercise or futile gesture" (citing *Keegel*, 627 F.2d at 374, other citations omitted)); *Keegel*, 627 F.2d at 374 (finding defendants had asserted a "meritorious defense" where they "alleged lack of subject matter jurisdiction and denied any misrepresentations, fraudulent acts, or securities law violations" in "somewhat broad and conclusory . . . allegations").

The premises are hardly in a rentable state, according to plaintiff and as documented in the Inspection Report.  At this time, however, the Court lacks sufficient evidence to conclude decisively that the damage to the premises exceeds what would be considered normal wear and tear after a multiyear lease, let alone that the present condition of the property is the direct result of defendants' acts or omissions.  Plaintiff may well succeed on its claims eventually, but "[o]n a motion for relief from the entry of a default . . . all doubts are resolved in favor of the party seeking relief," *Jackson*, 636 F.2d at 836, and defendants' contestation of the degree to which they are legally liable for the current state of the premises warrants an opportunity for them to present those defenses in full, by permitting the case to proceed on the merits.

Defendants also assert that setting aside the entries of default is warranted because they have a meritorious defense in the form of "a significant counterclaim and a defense of prior breach of the lease by Plaintiff for taking and holding portions of the property at issue in this action in violation of the parties' lease."  Defs.' 3d Mot. Vacate ¶ 6.  The Court previously dismissed these arguments because defendants had "alleged no 'specific facts' supporting the allegation of prior breach," *Egypt DOD I*, 2021 WL 3737682 at *6 (quoting *Collura*, 2016 WL 409228, at *12), and because the "alleged breach of the lease f[ell] far short of a 'complete

23

defense' to defeat the ejectment claim, and, at best, might support a counterclaim for damages," *id.*  Raising this defense again in the instant motion, defendants now supplement their position with an answer and counterclaim that set out supportive factual allegations. [6]

While defendants continue not to contest certain of plaintiff's allegations against them, including their failure to pay rent timely and in full from March 2020 through the end of the lease term, they do make several arguments in the Answer and Counterclaim which, if proven at trial, would offset the damages they would otherwise owe to plaintiff.  *See* Defs.' 3d Mot. Vacate ¶ 7.  Specifically, defendants assert that while they "did not pay rent once the COVID crisis struck," they "did make multiple large payments to Plaintiff during the crisis in order to attempt to keep up" with their obligations under the Lease Agreement, although they are "without knowledge" as to "which months the Plaintiff applied said large payment to."  Answer ¶ 15.  If supplemented through the discovery process and proven at trial, this claim could alter or diminish defendants' liability for breach of lease in Count VII, as well as the damages owed under Counts II through VI in connection with defendants' civil ejectment from the property. [7]

Defendants also seek to file a counterclaim, in which they allege a prior breach of the Lease Agreement by plaintiff for occupying three hotel rooms for the duration of most of the lease term without providing advance written notice, as required by the Lease Agreement. Counterclaim ¶ 9; *see also* Lease Agreement § 2.  They further allege that plaintiff breached the Lease Agreement by occupying several parking spaces that had been assigned to defendants

---

[6]     Defendants seek to have their answer and counterclaim "deemed timely filed," Defs.' 3d Mot. Vacate at 3, and though not timely, the docketing of these documents will be permitted.

[7]     Defendants also assert that "[g]iven the COVID pandemic, the rent stated in the Lease may not be the appropriate measure for Mesne profits" as plaintiff seeks in Count II, and that "late fees may not be appropriate under the devastating circumstances of the pandemic, nor . . . double rent," as plaintiff seeks in Counts IV and V, respectively.  Defs.' Opp'n ¶ 2.  Although they do not elaborate, presumably defendants intend to suggest that the effects of the COVID-19 pandemic on the commercial real estate market are such that plaintiff would no longer be able to lease the premises for the same amount if negotiating today.

under the Lease Agreement continuously throughout the seven-year lease term.  Counterclaim ¶ 11; *see also* Lease Agreement at 1.  While plaintiff may be correct that providing insufficient notice of the use of hotel rooms or using parking spots without authorization would "not constitute a material breach justifying non-payment of any rent for more than a year, nonpayment of late fees, or the numerous other breaches detailed and calculated in Plaintiff's Motion," Pl.'s Opp'n at 7, defendants' allegations are conceivable and deserving of consideration on the merits, given the "strong policies favor[ing] the resolution of genuine disputes on their merits," *Jackson*, 636 F.2d at 832.  *See also Farmer v. American Fed. of Gov't Emps.*, No. 19-cv-1631 (RC), 2020 WL 2800680, at *6 (D.D.C. May 29, 2020) (vacating entry of default because "[w]hile the Court is unsure of its ultimate merit, [defendants'] defense strikes the Court as plausible" and their "burden here is low."); *Enka Insaat Ve Sanayi A.S. v. Gabonese Republic*, 406 F. Supp. 3d 84, 90 (D.D.C. 2019) (vacating entry of default because "[a] likelihood of success is not the measure for determining whether a defense is meritorious" and because petitioner's "responses to Respondents' proposed defenses makes it clear that at least some of the defenses asserted by Respondents require consideration on the merits by this Court" (internal citations omitted)).

Thus, defendants have advanced a meritorious defense providing "reason to believe that vacating the [entries of default] will not be an empty exercise or futile gesture." *Marino*, 685 F.3d at 1080.  This standard having been satisfied, the third *Keegel* factor weighs in favor of setting aside the entries of default against them.  Given that defendants cannot reasonably be considered "essentially unresponsive part[ies]," *Mwani*, 417 F.3d at 7, the Court will set aside the entries of default against them so the parties may assert their interests and defenses and

resolve their dispute on the merits.  As this case proceeds, the parties are expected to comply fully with all applicable procedural rules on a timely basis.

### B.   Plaintiff's Motion for Sanctions

Plaintiff also seeks sanctions, under FED. R. CIV. P. 11, "relating to Defendants' filing of [their] Opposition to Plaintiff's Motion for Default Judgment Awarding Damages and Defendants' Motion to Vacate Default."  Pl.'s Mot. Sanctions at 1.  Plaintiff accuses defense counsel of "knowingly greenli[ghting] a recycled motion twice rejected by the Court without so much as mentioning those past filings, or the Court's Order on the matter," *id.* at 2, and of "consistent[ly] flaunting" the Court's meet and confer requirements, *id.* at 1, by declining to "give Plaintiff's counsel any time to even consider consenting to the potential motion" to vacate the entries of default or "attempt to narrow areas of disagreement," Pl.'s Opp'n at 11–12. Characterizing the renewed motion to vacate as a "naked attempt to further delay a final ruling in this case and to drive up unnecessary attorney's fees for Plaintiff," Pl.'s Mot. Sanctions at 2, plaintiff argues that sanctions are appropriate against defendants as well as their counsel because "[i]t is the counsel of record's responsibility to monitor the validity of legal filings and ensure that judicial resources are not wasted," *id.* at 1, and "[s]anctions made solely against Defendants are unlikely to actually be paid in this case," *id.* at 2.  Plaintiff asserts that an "appropriate remedy" would be awarding plaintiff "the amount of attorney's fees incurred to prepare the Reply to Defendants' frivolous Opposition" to the motion for default judgment "as well as the attorney's fees needed to prepare this Motion for Sanctions."  *Id.* at 3.

Defendants, in turn, argue that sanctions are unwarranted.  They reject the notion that the motion to vacate the entries of default presently before the Court is "recycled" because, while the renewed motion overlaps with previous motion, it does not duplicate it, and seeks alternative relief not previously requested (namely, trial on issue of damages and setoffs).  Defs.' Opp'n

Mot. Sanctions ¶¶ 2, 5–6.  They also note that "practically speaking," there was "no delay caused" by defendants' filing of their renewed motion to vacate, as plaintiff was able to file a "unified brief" combining its opposition to the renewed motion to vacate with its reply in support of its motion for default judgment.  *Id.* ¶ 9.  As for plaintiff's accusations regarding the meet and confer requirements, defendants state that they "attempted to meet and confer by telephone, as is appropriate during the current pandemic," with both of plaintiff's counsel of record, "and, in fact, did confer within an hour or two of filing the second Motion to Vacate."  *Id.* ¶ 8.

Defendants' conduct in this litigation has been far from exemplary, but it does not rise to the level of sanctionable behavior, as Rule 11 sanctions "are an extreme punishment for filing pleadings that frustrate judicial proceedings" and are "not impose[d] . . . lightly."  *Jordan v. Dep't of Labor*, 273 F. Supp. 3d 214, 241 (D.D.C. 2017).  "Rule 11 sanctions are harsh punishment intended for those who frustrate judicial proceedings," *Cauderlier & Assocs., Inc. v. Zambrana*, 463 F. Supp. 2d 63, 64 (D.D.C. 2006), or file pleadings "to harass another party," *United States v. Sum of $70,990,605*, No. 12-cv-1905 (RDM), 2018 WL 4623568, at *5 (D.D.C. Sept. 25, 2018).  The test for sanctions under Rule 11 "is an objective one: that is, whether a reasonable inquiry would have revealed that there was no basis in law or fact for the asserted claim.  The Court must also take into consideration . . . what effect, if any, the alleged violations may have had on judicial proceedings."  *Hickey v. Scott*, 738 F. Supp. 2d 55, 72 (D.D.C. 2010) (quoting *Scruggs v. Getinge USA, Inc.*, 258 F.R.D. 177, 180–81 (D.D.C. 2009)); *see also Hourani v. Mirtchev*, 796 F.3d 1, 17 (D.C. Cir. 2015).  Factors to consider in determining whether to impose a sanction under Rule 11, or what sanction to impose, include:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on

the litigation process in time or expense; whether the responsible person is trained
in the law; what amount, given the financial resources of the responsible person,
is needed to deter that person from repetition in the same case; what amount is
needed to deter similar activity by other litigants.

FED. R. CIV. P. 11 ADVISORY COMMITTEE'S NOTE TO 1993 AMENDMENT (the "RULE 11 Factors").

These factors, considered together, militate against imposing sanctions on defendants and their

counsel here.

First, with regard to defendants' recent filings, plaintiff mischaracterizes the relationship

of defendants' renewed motion to vacate the entries of default with their previous motion to

vacate.  While the filings do overlap to a degree, the instant motion is not entirely "recycled" and

does acknowledge the Court's previous order denying the requested relief.  Defs.' Opp'n Mot.

Sanctions ¶ 2; *see also* Defs.' 3d Mot. Vacate at 1 ("Defendants . . . hereby move[] this Court

pursuant to Fed. R. Civ. P. 55 and 60 for Relief from this Court's Order dated August 24, 2021").

While the renewed motion to vacate is mistakenly titled "Memorandum in Opposition to

Plaintiff's Motion for Default Judgment for Damages," Defs.' 3d Mot. Vacate at 1, defense

counsel adequately explains that this was a typographical error not intended to mislead the Court,

Defs.' Opp'n Mot. Sanctions ¶ 7, and the text of the document makes clear that this is, in fact, a

motion to vacate the entries of default, rather than a memorandum in opposition to plaintiff's

motion for default judgment.  Thus, defendants' errors did not "infect[] the entire pleading" and

do not appear to have been "intended to injure," but rather reflect "negligen[ce]."  *See* RULE 11

Factors.

Furthermore, defendants' renewed motion has had minimal effect "on the litigation

process in time or expense," *id.*, given the overlap between the issues implicated by plaintiff's

motion for default judgment and defendants' renewed motion to vacate the entries of default, to

which plaintiff was able to respond in a combined filing with its reply.  *See* Pl.'s Opp'n.  Plaintiff

asserts that it should be reimbursed for the attorney's fees incurred in preparing its reply to defendants' "frivolous Opposition," Pl.'s Mot. Sanctions at 2, as if drafting and submitting a reply in support of its motion was an unforeseeable burden.  Yet, plaintiff cannot have been caught off guard by defendants' filing of an opposition, or its own need to file a reply as a result, given that litigants plainly may submit papers in opposition and reply, so long as they do so within the requisite time periods, as defendants did here.  *See* D.D.C. LCvR 7(b), (d).  While perhaps irksome, defendants' renewed motion was not inherently improper, nor does it appear to have been "intended to injure."  RULE 11 Factors.

As for plaintiff's allegations that defendants have not complied with the Court's meet and confer requirements, *see* Pl.'s Mot. Sanctions at 3, defendants' delayed overtures to plaintiff's counsel does not appear to have created any delay in the litigation process "in time or expense," RULE 11 Factors, nor is it evident that defendants' lackluster compliance with the requirement resulted in any measurable advantage to defendants.  While plaintiff asserts that defendants' delayed attempt to meet and confer prior to filing their renewed motion to vacate deprived plaintiff of "any time to even consider consenting to the potential motion," Pl.'s Opp'n at 11, plaintiff's subsequent, vehement opposition to defendants' motion suggests its deprivation of time to consider the motion has had minimal effect.

Throughout this litigation, defendants' degree of engagement has been barely sufficient.  Their conduct, however, does not rise to the level of severity to warrant the "extreme punishment" of Rule 11 sanctions.

## IV.  CONCLUSION

For the reasons set forth above, plaintiff's motion for default judgment as to Counts II through VIII of its Complaint and motion for sanctions are both denied.  Defendants' motion to

vacate the entries of default is granted.  The parties are directed to file a joint Meet and Confer Report within ten days of the issuance of the Order accompanying this Memorandum Opinion.

Date: March 10, 2022

_____
BERYL A. HOWELL
CHIEF JUDGE